# IN THE COURT OF APPEALS OF IOWA

No. 17-0297
Filed May 3, 2017

**IN THE INTEREST OF S.W.,**
**Minor Child,**

**E.W., Father,**
    Appellant,

**T.A., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Emmet County, Ann M. Gales, District Associate Judge.

The mother and father appeal separately from the termination of their parental rights to their minor child. **AFFIRMED ON BOTH APPEALS.**

Michael H. Johnson of Johnson Law Firm, Spirit Lake, for appellant father.

Bethany J. Verhoef Brands of Brands Law Office, Spirit Lake, for appellant mother.

Thomas J. Miller, Attorney General, and David M. Van Compernolle, Assistant Attorney General, for appellee State.

Shannon L. Sandy of Sandy Law Firm, P.C., Spirit Lake, guardian ad litem for minor child.

Considered by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

**I. Mother's Appeal.**

The mother filed a petition on appeal stating, "The mother . . . seeks reversal of the juvenile court order terminating her parental rights with respect to her daughter S.W. *only if* the Court reverses the juvenile court [order] terminating the parental rights of the father." The mother maintains her consent to the termination of her rights was conditioned upon the termination of the father's parental rights. *See* Iowa Code § 232.116(1)(a) (2016). However, the mother's parental rights were terminated on additional grounds as well. *See id.* § 232.116(1)(g), (h). Yet the mother does not challenge the other statutory grounds, claim termination is not in S.W.'s best interests, nor ask us to apply a permissive factor in subsection (3) to save the parent-child relationship. Without further consideration, the termination of the mother's parental rights to S.W. is affirmed. *See In re J.J.A.*, 580 N.W.2d 731, 740 (Iowa 1998) (refusing to consider issues that have not been properly raised); *see also* Iowa Ct. R. 21.26(e).

**II. Father's Appeal.**

The father maintains the State has not proven (1) the statutory grounds for termination by clear and convincing evidence and (2) termination is in S.W.'s best interests. He also challenges the court's finding that the State made reasonable efforts to reunify him with S.W., and the ruling denying his motion to reopen the record.

**A. Background Facts and Proceedings.**

The Iowa Department of Humans Services (DHS) became involved with this family almost immediately after S.W.'s birth, in May 2014, because the mother's parental rights to three other children had already been terminated. DHS began offering a number of services to the family, and S.W. remained in the parents' care.

At the time of S.W.'s birth, the father was on probation for stealing money from his former employer. The father already had an extensive criminal history, which started when he was a minor and continued through adulthood. As an adult, he had a number of convictions involving the possession of marijuana and drug paraphernalia, and he had already spent a period of time in prison following convictions for armed robbery and burglary in the second degree. The father's criminal conduct continued, and in November 2014, the father was arrested for the domestic assault of the mother. The father was ordered to enroll in a batterer's education program.

In September 2015, the local police obtained a search warrant to search the parents' home. The father had been breaking into a neighbor's garage to take beer and other items, and he had been caught on a camera set up by the neighbor. When the police searched the parents' home, they found the items that had been taken from the neighbor, as well as methamphetamine. The mother and S.W. were tested for methamphetamine; the mother's test came back negative but S.W.'s was positive. The father refused to be tested.

On September 16, 2015, S.W. was removed from the parents' care and placed with the same foster family who had adopted the mother's other three

children—S.W.'s half-siblings. After the father was jailed, the mother told DHS the father had been physically abusive to her throughout their relationship, which started in November 2012. She showed a child protective worker places in the family home where the father had punched holes in doors and walls; the father had covered the various spots with wall-hangings in order to escape the notice of service providers who came to the home. The mother obtained a protective no-contact order and listed herself and S.W. as protected parties; the father consented to the entry of the order.

The father reached a plea deal with the State. As part of the plea, the charges from the November 2014 domestic abuse were dropped, as well as all drugs charges stemming from the search. The father pled guilty to two counts of burglary, and he was sentenced to a term of incarceration not to exceed five years. His discharge date for the full term of incarceration was February 20, 2018.

The termination hearing was held on two dates: May 31 and June 7, 2016. The father participated in the hearing from prison by way of telephone and Skype. At the hearing, the father testified he had a parole hearing scheduled for August 2016, and he expected to be paroled. The father denied ever being physically abusive toward the mother, in spite of the testimony of the father's step-grandfather who testified he twice witnessed the father being physically abusive—once "[the father] had [the mother] by the throat, was hitting her in the shoulder in [the grandfather's garage]," and another time the grandfather had to pull the father off the mother in the basement. Additionally, the father had not taken an anger management or batterer's education class.

Because of the ongoing no-contact order, the father did not have visits or contact with the S.W. from the time he was arrested in mid-September 2015 through the termination hearing in June 2016, except for a one-time modification to the order, which allowed DHS to bring S.W. to the prison for a visit with the father on S.W.'s second birthday in May 2016. While the father thought the visit went really well, the foster mother testified that she did not believe S.W. recognized the father at the time of the visit and S.W. had not mentioned him again after. The father was in prison approximately three and one-half hours away from the foster family's home, so the trip required S.W. to spend a long period of time in the car. Additionally, as the father testified, at the time of the termination hearing, S.W. was approximately twenty-five months old, and the father had been incarcerated for a combined total of almost one year of that time.

The foster mother testified S.W. called her and her husband "mommy" and "daddy" and she was well-bonded with her half-siblings. The foster mother stated S.W. was very scared of men in general when she first came to live with them but had since become more comfortable with them. S.W. also had health issues at the time she was removed from her parents' care—her baby teeth were rotting and she had hearing issues that were causing communication delays due to a history of ear infections that had not been fully treated.

On January 5, 2017, the father filed a motion to reopen the evidentiary record. In it, he claimed his circumstances had "materially changed since the date of the Court's last hearing" and indicated he was to be discharged from a residential treatment facility on January 9. The State and the guardian ad litem resisted the father's motion.

The court filed its written order in the termination-of-parental-rights proceedings on February 10, 2017. In it, the court denied the father's request to reopen the record, noting permanency for S.W. "has been delayed far too long and to reopen the record will result in even longer delays." The court then terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(e) and (h).[1]

The father appeals.

**B. Standard of Review.**

"We review proceedings to terminate parental rights de novo." *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012).

We review the court's decision not to reopen the record for additional evidence for an abuse of discretion. *See In re J.R.H.*, 358 N.W.2d 311, 318 (Iowa 1984) ("In a trial to the court, the court has broad discretion to reopen the evidence . . . .").

**C. Discussion.**

While the father nominally challenges the court's ruling under Iowa Code section 232.116(1)(h), he does not argue S.W. could have been returned to his care at the time of the termination hearing—when he was in prison. *See* Iowa Code § 232.116(1)(h)(4); *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("At the time of the termination hearing, there was clear and convincing evidence the

---

[1] In its written order, under the section "order, judgment, and decree," the court cited to section 232.116(e) rather than 232.116(1)(e). The father maintains the court's order "purports to terminate a parent's rights under an inappropriate section of the Iowa Code" and "is defective." After reviewing the order in its entirety, we note that court referred to the section incorrectly only one time; it referred to the section correctly nine times, including setting out the language of the section and discussing it in detail. We are not concerned by the one typographical error in the court's order.

children could not be returned to the care of [the parent].");  *see also A.B.*, 815 N.W.2d at 774 ("When the juvenile court terminated parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record.").  Rather, he claims he should have been given a six-month extension to work toward reunification.

However, a request for a six-month extension can only be granted if the court can make "the determination the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *See* Iowa Code § 232.104(2)(b).  At the time of the termination hearing, the court could not find the need for removal would no longer exist in six months.  First, even if the father's parole hearing went as well as he anticipated, there was testimony the father would not actually be released until he finished his current drug-rehabilitation program, which was not scheduled to be completed until October or November 2016.  If he was not granted parole, the father's full discharge date was not until February 2018.  Additionally, even if he was released within six months of the termination hearing, the father had not completed anger management or batterer's education; in fact, he still denied he had perpetrated domestic violence against the mother in spite of strong evidence supporting her claims.  S.W. had spent nearly half of her life away from the father due to his frequent incarcerations, and she had only seen him once in the nine months preceding the hearing.  Thus, even if S.W. could be returned to the father's care, the transition would have to occur gradually—a transition that could not begin while there was a no-contact order in place, and while the father was incarcerated three and one-half hours away.

The father claims the State did not make reasonable efforts to reunify him with S.W. The father claims that because he spent a number of months in prison without access to services DHS and the court required him to complete and because he was not afforded visits with S.W. while in prison, his parental rights should not be terminated. The imprisonment of a parent does not absolve DHS of its statutory mandate to provide reunification services. *In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). Still, "[t]he services required to be supplied an incarcerated parent, as with any other parent, are only those that are reasonable under the circumstances." *Id.* at 525. Here, DHS originally anticipated the father could and would enroll in the necessary classes—batterer's education, anger management, and drug rehabilitation—through the prison. Once it became apparent the father either was not eligible for those classes (because the plea agreement dismissed all drug- and domestic-violence-related charges) or the prison did not offer the classes, DHS began discussions with the prison to determine how the father could receive the services while incarcerated. This took some time; personnel from both DHS and the prison testified this was not a typical arrangement, and there was some necessary back-and-forth to determine how DHS could provide services within the rules and framework set by the prison. Additionally, DHS testified it could not facilitate visits between S.W. and the father due to the no-contact order in place, which named S.W. as a protected party. At the time of the hearing, the father had not attempted to have the order dismissed or modified, other than for the one-time visit that took place in May 2016. Even if the no-contact order had not been in place, S.W. was two years old and resided a number of hours from the father. The foster mother reported

S.W. became car sick and vomited during the trip to see the father, and the seven or eight hour road trip was "a long time for [S.W.] to be in the car"—especially in relation to the length of the visit, which was one and one half hours. We agree with the district court that the efforts made by DHS were reasonable in these circumstances.

Although the father maintains termination of his parental rights is not in S.W.'s best interests, we disagree. S.W. was well-bonded with her foster family and they were ready and willing to adopt her. Being adopted by the foster family would allow S.W. to maintain a relationship with her biological siblings. Additionally, the foster family had allowed the mother to remain part of her other children's lives after adopting them, and they testified they were willing to do the same with S.W. and the mother and father—so long as certain expectations regarding safety and respect of S.W.'s new family were met. For all the reasons already considered, termination of the father's parental rights is in S.W.'s best interests.[2]

Finally, the district court did not abuse its discretion in refusing to reopen the record in January 2017—approximately seven months after the termination hearing. Even if the court reopened the record and verified the father's claims from his motion—that he was to be discharged, had obtained employment and housing, and had completed an anger management course—S.W. could not then

---

[2] The father has not argued, and we have not found, that any of the permissive factors in section 232.116(3) should be applied in this circumstance. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (stating factors are permissive, not mandatory); *see also In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010) ("Finally, before terminating a parent's parental rights, the court must consider if any of the exceptions contained in section 232.116(3) allow the court not to terminate.").

be returned to the father. At that point, S.W. had been in the care of her foster family for approximately half of her life and had little contact with the father for the prior sixteen months. Giving the father even more time to work toward reunification is not contemplated by the statute, and S.W. deserved permanency. *See C.B.*, 611 N.W.2d at 495 ("Once the limitation period lapses, termination proceedings must be view with a sense of urgency."); *see also In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a chid's best interest" are the child's safety and her "need for a permanent home").

We affirm the termination of the father's parental rights.

**AFFIRMED ON BOTH APPEALS.**